# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 20, 2024

Lyle W. Cayce
Clerk

No. 22-40617

UNITED STATES OF AMERICA,

*Plaintiff—Appellee,*

*versus*

VINCENT MARCHETTI, JR.,

*Defendant—Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 5:19-CR-25-3

_____

Before SMITH, GRAVES, and WILSON, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

Vincent Marchetti, Jr., was convicted of one count of conspiracy to commit illegal remunerations in violation of 18 U.S.C. § 371. He appeals that conviction and challenges the district court's application of the sentencing guidelines. We affirm the conviction and sentence.

## I.

Vantari Genetics LLC ("Vantari") was a medical laboratory specializing in pharmacogenetic testing. As of 2014, its key officers included Nicholas Arroyo (its CEO), Sean Parrish (its COO), Phillip Lamb (its CFO), and

No. 22-40617

Shaun Opie (its CSO). Vantari operated in Irvine, California, with a distribution center in Tempe, Arizona. It billed Medicare for providing lab testing services to Medicare beneficiaries.

Vantari's main means of obtaining medical samples from patients was to pay a national network of independent sales groups, or "distributors," to attract Medicare referrals to Vantari. Those distributors were mostly healthcare professionals with established relationships with physicians; alternatively, the distributors would hire healthcare professionals who had those established connections. Vantari would pay a distributor a percentage of the revenue from each Medicare referral. Marchetti, who operated Advanced Life Sciences LLC ("ALS"), was one of those distributors and had a network of sub-distributors.

Arroyo "thought that Vantari Genetics would be one of the largest genetic testing companies in the world. That was [his] goal." As a part of its growth, in the fall of 2013, Vantari engaged the law firm of Snell & Wilmer, LLP, to "put together a road map for [legal] compliance for Vantari." Lamb "drove a lot of . . . internal discussions about changes" to "the way that [Vantari] compensated people."[1]

In January 2014, Vantari agreed to pay ALS 35% of the business it received from ALS's referrals. That roughly coincided with growing concern about the legality of Vantari's method of compensating its distributors.

In the meantime, while Arroyo and Parrish were in California "running the operation a hundred percent of the time," Lamb and Opie "were working remotely." Arroyo and Parish grew "frustrated by the fact that

---

[1] Arroyo testified that Lamb joined the company "in early 2014." This appears to be slightly inaccurate, as Lamb was communicating with Snell & Wilmer on behalf of Vantari as early as September 2013.

[Vantari was] generating all this revenue, and people like Phil Lamb are partners, and Shaun Opie, our other partner, were sitting in Scottsdale, Arizona, in their—you know, in his $5 million mansion just hanging out all day long."

At some point, presumably between January and July 2014, Arroyo and Parrish formed a new entity called KNM Global. In July 2014, they agreed with Marchetti to increase the percentage Vantari paid ALS to 50%. In exchange, ALS would pass 5% back to KNM Global. That same month, Snell & Wilmer expressed concerns about the legality of Vantari's existing compensation scheme.

Arroyo regularly spoke to Marchetti about issues concerning the payment scheme. In July 2014, Marchetti proposed restructuring the contract. Vantari discussed possible changes to the compensation structure with Snell & Wilmer. Vantari ultimately adopted a model that would pay ALS a percentage "net collected non-federal reimbursements" plus a fixed amount per month per "active" representative.[2] That agreement allowed ALS to hire "contractor representative[s]" who would, *inter alia*, "[i]ntroduce and market the Vantari brand to the physician community."

Arroyo assured Marchetti that there were ways to achieve the same levels of compensation as before the switch, "whether it was to increase the compensation on the commercial side of the business, whether it was to give them a heads up in terms of how many people that they needed to have actively working under the organizations to hit certain metrics, whether it was a form of bonus." And around September, Vantari paid ALS a $75,000

---

[2] The exact percentages and fixed amounts at any given point are unclear. One contract, signed by Marchetti on September 2, 2014, says 50% but $0 fixed. A later contract signed September 1, 2015, 47.5% and $3,000 fixed.

bonus.

Ultimately, Vantari established a system that would yield ALS what was being paid under the old system by giving the distributor the data needed to fabricate a sufficient number of reports to justify the payment. ALS engaged in this practice. In one instance, ALS submitted reports indicating activity from Drs. Chipotle, Lettuce, McDonald, Carl's, Burger, and King.[3] In other instances, it appears that ALS submitted reports artificially multiplying the activity of a single representative.

At least as early as 2015, "Parrish was extremely concerned that [his and Arroyo's] partners would start to catch on," so he created CodonDx ("Codon"), a limited liability partnership, as a "furtherance . . . of what KNM Global originally was." Codon was run by Adam Matz, a friend of Parrish's. Matz "was placed to artificially buffer us from any kind of feedback or anything that would come to the company from an outside source, whether that be our partners, whether it be a regulatory body, whether it be a legal problem." Matz understood the company "to be a sales and marketing company." It would also "manage and be lab consultants."

Codon served as an "independent sales representative organization[]" for a competing lab called Althea. Codon got paid directly by Althea. Codon, in turn, had an agreement with ALS "to pay them 40 percent commission on each reimbursable assay that pays over $200."

Now servicing two labs, Marchetti expressed concern about the difficulty of using two distinct test swabs and asked Arroyo whether something could be done. Arroyo said that was something he "ha[d] the power to

---

[3] Marchetti contends that (1) a colleague generated the report, and he merely negligently rubber-stamped it, and (2) the report was never submitted for federal business. Resolving those contentions is not important to the resolution of this case.

control" and suggested Vantari could "validate Althea's sampling device for Vantari's tests and utilize the sampling device for both laboratories essentially." There was also a "logistical challenge[] associated with where does it go to . . . does it go to [Althea], or does it go to [Vantari]?" That led to mix-ups in shipments. So Arroyo ended up diverting some of the shipments, based on which physician's practice it came from, to Vantari's distribution center in Tempe instead of sending them right to Irvine.

Which doctors' practices got rerouted was based on "the book of business that [Arroyo] . . . intend[ed] to send to Althea." A substantial number of the practices whose samples were diverted were associated with ALS. That diversion was effected by Jessica Conn, Codon's sole employee and Arroyo's girlfriend. She would transcribe orders between prescription pads for the two laboratories. Marchetti would visit the distribution center in Tempe with some regularity and on at least one occasion left a gift card for Conn because "she was doing a great job."

In March 2015, Lamb sent an e-mail to Parrish, Marchetti, and another person not relevant here, substantiating his concerns about the legality of Vantari's payment scheme. This appears to be a part of a more extended dialogue among Lamb, Marchetti, and other stakeholders about the legality of the payment scheme. In October 2015, Lamb tried to convince Marchetti to adopt a W-2 model instead. After that conversation, Arroyo told Lamb to "butt out." Even so, Lamb warned Marchetti at least one more time in a conversation after November 2015.

In all, Vantari paid ALS over $2 million related to federal healthcare program referrals.

At trial, the government laid out the facts above. It also introduced fraud alerts and advisory opinions from the Department of Health and Human Services's Office of Inspector General ("HHS-OIG").

No. 22-40617

Marchetti was convicted of one count of conspiracy, 18 U.S.C. § 371, to commit a violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). Subsections 1320a-7b(b)(1)(A) and (B) make it a crime for a person knowingly and willfully to *solicit or receive* kickbacks, bribes, or illegal remuneration in return for a referral for services, or in return for arranging for the furnishing or recommending the ordering of items or services under a federal health care program. Subsections (b)(2)(A) and (B) make it a crime for a person knowingly and willfully to *offer or pay* kickbacks, bribes, or illegal remuneration to induce referral for services, or to induce arranging for the furnishing or recommending the ordering of items or services under a federal health care program.

Marchetti was sentenced to forty-eight months' imprisonment and two years of supervised release. He appeals his conviction and sentencing on five grounds: (1) whether the government proffered sufficient evidence to sustain the conviction, (2) whether the district court abused its discretion in failing to submit Marchetti's theory of the defense instruction, (3) whether the court abused its discretion by purportedly constructively amending the indictment, (4) whether Marchetti is entitled to a new trial for cumulative error, and (5) whether the court imposed an unreasonable sentence based on an incorrect application of the guidelines. We reject Marchetti's challenges and affirm his conviction and sentence.

II.

First, we examine whether Marchetti has shown the evidence is insufficient to support the conviction.

A.

"Where, as here, a defendant has timely moved for a judgment of acquittal, this court reviews challenges to the sufficiency of the evidence de novo." *United States v. Nicholson*, 961 F.3d 328, 338 (5th Cir. 2020) (citation

omitted). "Though de novo, this review is nevertheless highly deferential to the verdict." *Id.* (quoting *United States v. Tinghui Xie*, 942 F.3d 228, 234 (5th Cir. 2019)). "Because of the shortcomings inherent in examining a 'cold appellate record without the benefit of the dramatic insights gained from watching the trial,' we review the 'evidence and all reasonable inferences in the light most favorable to the prosecution' and to determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *United States v. Vargas-Ocampo*, 747 F.3d 299, 301, 303 (5th Cir. 2014) (en banc)).

> To convict Marchetti under § 371, the government must prove:
>
> (1) an agreement between two or more persons to pursue [the] unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy.

*United States v. Barnes*, 979 F.3d 283, 295 (5th Cir. 2020) (alteration in original) (internal quotation marks and citations omitted).

The government offered in its indictment, and now on appeal, two possible unlawful objectives, namely, violation of either 42 U.S.C. § 1320a-7b(b)(1)(A)-(B) or 42 U.S.C. § 1320a-7b(b)(2)(A)-(B). Subsection (b)(1) prohibits, *inter alia*, "knowingly and willfully *solicit[ing] or receiv[ing]* any remuneration . . . in return for referring an individual to a person for the furnishing . . . of any . . . service for which payment may be made . . . under a Federal health care program." (Emphasis added.) Subsection (b)(2) prohibits, *inter alia*, "knowingly and willfully *offer[ring] or pay[ing]* any remuneration . . . to any person to induce such person . . . to refer an individual to a person for the furnishing . . . of any . . . service for which payment may be

made . . . under a Federal health care program." (Emphasis added.)[4]

Although the bulk of Marchetti's conduct was undoubtedly sketchy and maybe even criminal, it was not, by and large, a violation of the Anti-Kickback Statute. But because Marchetti's conduct surrounding Codon is sufficient to prove that he committed an Anti-Kickback violation, we affirm the conviction.

## B.

Marchetti challenges each prong of the requirement under *Barnes*. On the first prong, Marchetti contends that there was no "unlawful objective" at issue here. *Barnes*, 979 F.3d at 295 (cleaned up). Although Marchetti is right that much of his conduct does not implicate the AKS, his conduct involving the redirection of referrals to Codon was an "unlawful objective" and violated the AKS.

*Miles* is this court's seminal case reversing an AKS conviction on sufficiency. We found that the following scheme did not violate the AKS:

(1) Premier Public Relations ("PPR") distributed information about Affiliated Professional Home Health ("APRO") which provides home health services.
(2) This included distribution to "local medical offices."
(3) "When a physician determined that home health care services were needed for a patient, the physician's office might contact" PPR.
(4) If so, PPR gave APRO the patient's information for billing purposes.
(5) APRO pays PPR per client gained.

---

[4] For some reason, Marchetti cites only (b)(1) when describing the indictment. But at least some of the cases he mentions interpret (b)(2) rather than (b)(1). *See, e.g.*, *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004). The absence of an explicit distinction muddles his argument.

*Miles*, 360 F.3d 479. Our court reversed the APRO owners' convictions under the AKS. *Id.* at 474.

A major factor in *Miles* is that "[t]he payments . . . were not made to the relevant decisionmaker." *Id.* at 480. We carefully explained when "non-doctors would fall within the scope of the statute." *Id.* We pointed to a case in which

(1) A "pacemaker monitor service made payments to a [salesman] based on the number of patients that he signed up with the service." *Id.* (citing *United States v. Polin*, 194 F.3d 863, 864–65 (7th Cir. 1999)).
(2) "The salesman's responsibilities included selling pacemakers, attending implant procedures, and making sure that patients were monitored following implantation." *Id.*
(3) That salesman "[made] the decision as to *which* service provider to contact for [a] patient." *Id.*
(4) The salesman "had never been overruled in the course of his fourteen-year career." *Id.*

The government responds that our court has walked back *Miles*, citing *United States v. Shoemaker*, 746 F.3d 614, 628 (5th Cir. 2014). The scheme found unlawful in *Shoemaker* was as follows:

(1) Tri-Lakes Medical Center ("TLMC") is a local hospital.
(2) On-Call Staffing ("OCS") provides nursing services.
(3) The chairman of TLMC's board of trustees asks the owner of OCS to pay him per hour of nursing OCS billed at TLMC.
(4) In exchange, the chairman would encourage the usage of OCS by lobbying the COO.
(5) TLMC's COO shortly thereafter got a raise from TLMC's chairman and began being compensated more directly by OCS's owner.

In *Shoemaker*, we concluded that this scheme violated the AKS. *Id.*

at 616.[5]  The court also distinguished *Miles*:

> Thus, *Miles* drew a distinction not between types of payees—"relevant decisionmakers" and others—but between a payer's intent to induce "referrals," which is illegal, and the intent to compensate advertisers, which is permissible. Moreover, the factual and procedural context of that case constrained our holding. *Miles* accordingly stands for a narrow legal proposition: Where advertising facilitates an independent decision to purchase a healthcare good or service, and where there is no evidence that the advertiser "unduly influence[s]" or "act[s] on behalf of" the purchaser, the mere fact that the good or service provider compensates the advertiser following each purchase is insufficient to support the provider's conviction for making a payment "to refer an individual to a person" under 42 U.S.C. § 1320a–7b(b)(2)(A). *Miles*, 360 F.3d at 480.

*Shoemaker*, 746 F.3d at 628 (footnote omitted) (emphasis omitted).  *Shoemaker* also distinguished *Miles* on the ground that in *Shoemaker* "advertising services [were] not at issue." *Id.* at 628–29.  The court stressed that the focus needs to be "on intent, not titles or formal authority." *Id.* at 629.[6]

_____

[5] The exact procedural posture is messy because of the number of counts and separate defendants.  In short, our court either affirmed the conviction of or vacated the district court's judgment of acquittal for TLMC's COO and OCS's owner pertaining to AKS violations.

[6] This is a good spot to deal with the elephant in the room.  *Miles* is about a charge brought under (b)(2)(A), *Shoemaker* is predominantly about (b)(2)(B), and Marchetti's case involves a conspiracy to violate (b)(1)(A), (b)(1)(B), (b)(2)(A), and (b)(2)(B).  No party makes a big enough point about this.  Marchetti seems to miss the distinction entirely.  *See supra* note 4.  And the government makes passing reference to a footnote in *Miles* that notes the distinction and mentions it again in refuting Marchetti's proposed jury instructions.

No. 22-40617

Although *Shoemaker* takes away from the focus on the identity of the payee, our court has seemingly embraced the emphasis on "gatekeeping" in other post-*Shoemaker* cases.[7] We read our caselaw as a whole to say that the identity of the payee, while not essential, speaks to the intent of the payer.[8]

_____

The (1)/(2) distinction appears to be purely about the direction the money is flowing. *See supra* note 4 & accompanying text. The (A)/(B) distinction is trickier. The government is right that *Miles* considered only (b)(2)(A) and not (b)(2)(B). The panel in *Miles* explicitly left open the idea that the provisions in (b)(2)(B) might capture the conduct in that case. *See* 360 F.3d at 480 n.3. Maybe payments from Vantari to ALS could be payments to "recommend purchasing" Vantari's services. But it is unclear how much scope this additional level of removal adds to the AKS. *Shoemaker*—a case about (b)(2)(B)—leaves room for permissible advertising. *See* 746 F.3d at 628. Since the (A)/(B) distinction cannot be read so broadly as to subsume permissible advertising, the government still needs to prove something about Marchetti's exercising undue influence on patients' selection of services. *Shoemaker* is clear about that:

> [I]n paying [the chairman], [the owner of OCS] was not asking for a brochure bearing his company's name to be distributed to TLMC staff; rather, enough evidence showed that he wanted [the chairman] to exploit his personal access to TLMC executives, including [the COO], and to ensure that TLMC favored [the owner's] company when it chose nursing services.

*Id.* at 629. The structure of Vantari's contract with ALS alone does not do that.

[7] *See, e.g.*, *United States v. Cooper*, 38 F.4th 428, 433 (5th Cir. 2022) ("[T]he referrer typically serves a gatekeeping role, facilitating or approving a 'patient's choice of provider.'" (quoting *Stop Ill. Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743, 749 (7th Cir. 2020)).

[8] A stronger reading of *Shoemaker*'s cabining of *Miles* risks placing that panel in direct opposition to the *Miles* panel. To the extent that this were the case, "the earlier [case, *Miles*,] . . . controls." *Harvey v. Blake*, 913 F.2d 226, 228 n.2 (5th Cir. 1990). For example, one might read *Shoemaker* for the proposition that *Miles* is not at all about "relevant decisionmakers." 746 F.3d at 629. That would flatly contradict *Miles*. *Miles* recounts the holding in *Polin*, noting, "because the salesman in *Polin was the relevant decisionmaker* and his judgment was shown to have been improperly influenced by the payments he received from the monitoring service, the Seventh Circuit correctly upheld the conviction of the individuals who paid the salesman in *Polin*." 360 F.3d at 481 (citations omitted). In short, interaction with the relevant decisionmaker has to be a part of the con-

That is, as between payment to a rancher and a doctor, it is dramatically easier to infer intent improperly to induce medical referrals from the doctor.

The central question for us is this: Did Vantari "inten[d] to induce 'referrals,' which is illegal," or did Vantari "inten[d] to compensate advertisers, which is permissible"? *Shoemaker*, 746 F.3d at 629.

*First*, we address the bulk of Marchetti's non-Codon related activities. The government did not produce sufficient evidence to sustain his conviction on those grounds. The government almost exclusively leans on the fact that Marchetti was compensated based on the "value of each referral." But it also admits that the compensation here was "[l]ike the fact pattern referenced in *Miles*." The structure of the contract alone is not sufficient evidence to produce a conviction under the AKS.[9]

Rather, the government must have produced something more. In particular, it needed to prove that Vantari and Marchetti intended "improperly [to] influence[]," *Miles*, 360 F.3d at 481, those who make healthcare decisions on behalf of patients. And that is where the government dropped the ball. Its case connects Marchetti to Vantari and KNM Global. But it does nothing to connect Marchetti to any referrer. It recounts undoubtedly questionable dealings to backstab co-workers and cover up the structure of payments, but nary a word about how Marchetti interacted with relevant

---

sideration in evaluating violations of the AKS. *Shoemaker* concedes at much. *See* 746 F.3d at 628.

[9] It may seem as though we are collapsing (1) the distinction between conspiracy to violate the AKS and (2) a substantive violation of it. Not so. But notably, the analysis relevant to either crime is the same in this context. That is, for there to be "an agreement between two or more persons to pursue [the] unlawful objective," *Barnes*, 979 F.3d at 295, there must be an "unlawful objective." Here, that "unlawful objective" is a substantive violation of the AKS.

decisionmakers.

The closest the government comes to providing the missing link is its assertion that Marchetti had "relationships with, access to, and influence over" doctors. The first two prongs of this triptych broaden the scope of the AKS beyond what it can bear. It would allow payments to an advertising agency, just not an agency that hires marketers with experience in the industry. That would be a counterintuitive outcome.

The final prong identifies the relevant inquiry. If Marchetti "improperly influenced" doctors, this case is open and shut. But the government does not provide a drop of color as to what Marchetti's influence looked like. Plainly, not every sort of influence is improper. (What are advertisers hired to do anyway?) Ultimately, the government fell short in providing any detail on the key relationship: the relationship between Marchetti and relevant decisionmakers. For a rational trier of fact to find a violation of the AKS, the government needs to provide *some* evidence that this relationship was more like the relationship in *Shoemaker* and less like the one in *Miles*.

Next we turn to Codon. Marchetti's conduct related to Codon was categorically different. The Codon scheme is much more like the hypothetical that *Miles* explicitly said *would* constitute an AKS violation: Medical service provider pays salesman, salesman makes choice about service provider, salesman is never overruled. *Miles*, 360 F.3d at 480.

To the same effect: Vantari pays Marchetti, Marchetti is part of a scheme that selects service provider for patient, that selection is apparently never overruled—because it seems to have been hidden from the patients and providers. In short, there is enough evidence that, in the context of the Codon scheme, Marchetti might have been the relevant decisionmaker. And he was being compensated per referral. That is a substantive AKS violation.

Recall, Marchetti motivated Vantari to align its swab-related protocols

with Althea's to streamline the process of servicing both. And that a substantial number of the practices whose samples were diverted were associated with Marchetti's company. And that Marchetti would visit the distribution center in Tempe with some regularity. And that on at least one occasion he left a gift card for Conn, the person physically transcribing prescriptions between labs, because "she was doing a great job." The bar for sufficiency is low, and when the government fails to clear it, it is often because it focused on the wrong inquiry. A rational trier of fact could infer, from the evidence presented, that Marchetti was sufficiently aware of and actively participating in the Codon scheme so as to be liable for an AKS violation.[10]

## C.

Next Marchetti avers that he lacked knowledge of the wrongdoing. A violation of the AKS requires that the defendant know that his actions were unlawful. *United States v. Nora*, 988 F.3d 823, 830 (5th Cir. 2021).

Marchetti's theory rests on his understanding of *Nora*, in which we reversed a conviction of an office manager whose role included

- coordinating patient intake,
- fielding calls from referrers of new patients,
- collecting patient information,
- assigning a field nurse,
- data entry.

*See id.* at 826–27. "There was abundant evidence at trial showing that Nora

---

[10] The government inexplicably buries the lede. It was not until oral argument that Codon became a prominent part of their sufficiency-of-the-evidence argument. We may still affirm Marchetti's sentence because (1) while not as prominent, the government does refer to the Codon scheme in its sufficiency arguments and, perhaps more importantly, (2) the burden falls on Marchetti to demonstrate that the evidence was insufficient, *see United States v. Moreno-Gonzalez*, 662 F.3d 369, 372–73 (5th Cir. 2011).

was involved in processing . . . payments and that he knew they were for patient referrals." *Id.* at 827. But since "the evidence did not prove that Nora understood [the] various practices and schemes to be fraudulent or unlawful," the evidence was insufficient to sustain Nora's conviction of conspiracy to violate the AKS. *Id.* at 831.

Unfortunately for Marchetti, he is no Jonathon Nora. He was not just a low-level administrative employee caught up unknowingly in somebody else's conspiracy. There is sufficient evidence to infer that Marchetti was put on notice that Lamb thought the scheme violated the AKS, was experienced in the healthcare field, and engaged in suspicious activities that allowed the jury to infer he was aware of unlawfulness, e.g., generating fake activity reports to attempt to disguise percentage-based compensation as something else and discussing compensation related issues personal e-mail address to personal e-mail address.

Marchetti's defense is that "he did not accept [Lamb's] interpretation of the fraud alerts." It is true that, in his conversations with Lamb, Marchetti seems to have outwardly maintained his preference for 1099s. But we review for whether "*any* rational trier of fact" could make the inference that Marchetti thought the plan was unlawful. *Nicholson*, 961 F.3d at 338 (emphasis added) (internal quotations marks and citation omitted). Considering all the evidence, *a* rational trier of fact could infer that Marchetti knew that redirection of referrals to Althea violated the AKS.

## D.

Finally, Marchetti obliquely challenges whether he committed an overt act in furtherance of a conspiracy.[11] He avers that "[t]he only overt

_____

[11] We note that this was only in his statement of facts. We assume that is fine and

acts alleged in the indictment that actually violated the AKS were committed by parties never shown to have had a relationship with Marchetti." (cleaned up).

This seems, at best, circularly based on Marchetti's theory that his conduct did not implicate the AKS. But it did. And focusing only on the Codon-related conduct, there is at least one glaring example of an overt act by Marchetti to further the Codon-related diversion of referrals, namely, suggesting the compatibilization of swabs between Vantari and Althea. He also visited the facility where the diversions took place and rewarded the employee who was effecting them. A rational jury could readily conclude that Marchetti committed an overt act in relation to the Codon scheme.[12]

Since Marchetti fails to show that the government provided insufficient evidence that his Codon-related conduct violated the AKS, we affirm his conviction against his sufficiency-of-the-evidence challenge.

## III.

We now turn to whether the district court abused its discretion when it refused to submit Marchetti's theory-of-the-case instruction.

---

address the argument as properly raised. But there are reasons to believe it might not be proper. *See, e.g.*, *McNeal v. City of Katy*, 2023 U.S. App. LEXIS 30568 at *11–12 (5th Cir. 2023) (per curiam) (unpublished) (indicating that a "scant[] reference" to something in an opening brief's statement of facts that is then fleshed out in the reply brief constitutes abandonment).

[12] It is worth noting that the overt act need not have been committed by Marchetti. *See Pattern Jury Instructions, Criminal Cases*, U.S. Fifth Circuit, District Judge Association, No. 2.15A (2019) (requiring proof "[t]hat *at least one of the conspirators* during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy" (emphasis added)).

A.

"A district court's refusal to include a defendant's proposed jury instruction in the charge is reviewed under an abuse of discretion standard, and the trial judge is afforded substantial latitude in formulating his instructions." *United States v. Daniels*, 247 F.3d 598, 601 (5th Cir. 2001) (citations and internal quotation marks omitted). "A district court abuses its discretion in omitting a requested jury instruction only if the requested language '(1) is substantively correct; (2) is not substantially covered in the charge given to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense.'" *United States v. Lucas*, 516 F.3d 316, 324 (5th Cir. 2008) (quoting *Treadaway v. Societe Anonyme Louis-Dreyfus*, 894 F.2d 161, 168 (5th Cir. 1990)). "[E]ven if we find that the district court abused its discretion, 'a conviction [cannot] be overturned for failure to instruct the jury on a defense unless the requested but omitted instruction has an evidentiary basis in the record which would lead to acquittal.'" *United States v. Hale*, 685 F.3d 522, 541–42 (5th Cir. 2012) (quoting *United States v. Spires*, 79 F.3d 464, 466 (5th Cir. 1996)).

Even so, "[a] defendant is usually entitled to have the court instruct the jury on the defense's 'theory of the case.'" *United States v. Robinson*, 700 F.2d 205, 211 (5th Cir. 1983) (citation omitted). But that entitlement is not unlimited. *See id.* *Inter alia*, "a defendant is not entitled to a 'judicial narrative of his version of the facts.'" *United States v. Lance*, 853 F.2d 1177, 1184 (5th Cir. 1988) (citation omitted).

B.

First, there is a threshold matter of which denial Marchetti is appealing. Marchetti (and the government) explicitly quote only one proposed instruction:

> In this case, Mr. Marchetti's theory of defense is that pure sales and marketing services are permissible and lawful. If you find that the defendant, Vincent Marchetti, Jr., was engaged in marketing and sales of PGx testing and was compensated in any manner for performance of services and did not offer or pay or solicit or receive remuneration to induce the referral of or arranging for the referral of PGx testing to Vantari, you must find the defendant not guilty of conspiracy to violate the Anti-Kickback Statute.

(Hereinafter, "Instruction #1.") But Marchetti complains about at least two other proposed instructions that were rejected at different points in the trial. And while later in his opening brief Marchetti refers to "Marchetti's requested instruction" in the singular, there is no other indicium as to which instruction he is referring to. In his reply brief, Marchetti refers in the plural to "the omission of either of Marchetti's theory of the case instructions." Sensing this lack of clarity, the government makes arguments about "Marchetti's proposed instruction and orally requested instructions."

The first of the other two instructions that might be appealed was a written request for an instruction. That instruction read,

> During this trial, you may hear evidence regarding Medicare healthcare program's civil rules and regulations and opinions regarding ethical standards and standards of care for independent laboratories, physicians, and marketing entities. I caution you that a violation of civil statutes, rules, regulations, ethical standards, or standards of care is not a crime. This is not a civil case. The defendants are not on trial for a civil violation or even medical malpractice. Even if you find that a Defendant violated the applicable civil statutes, rules, and regulations, a defendant cannot be convicted of a crime merely for breaching civil standards, rules, regulations, ethical standards, and standards of care applicable to his or her conduct. However, Medicare health care program's rules and regulations, ethical standards, and standards of care may be relevant in

determining whether a defendant acted with criminal intent, that is, knowingly and willfully to violate the Anti-Kickback statute. That is how you may consider the evidence. You are reminded that the Government must prove each element of the offense charged beyond a reasonable doubt.

(Hereinafter, "Instruction #2.")[13] The second was an oral request after the trial:

We ask the Court to instruct the jury that a percentage-based compensation structure to compensate individuals for performing sales and marketing services is not, per se, unlawful.

(Hereinafter, "Instruction #3.")

Despite this lack of clarity, we address each in turn, stipulating that they are all properly preserved and subject to the standard of review above.

## C.

We turn to Instruction #1. The government readily has the better of the argument on all three of the prongs in *Lucas*. For example, the government is correct that this instruction would require acquittal in a world where Marchetti was guilty of conspiracy but innocent of the substantive AKS violation. Because this makes the instruction legally erroneous, the district court has not abused its discretion. *See Lucas*, 516 F.3d at 324. That alone is sufficient. Even were it not, the government is probably right that the instructions that were issued do not imply that percentage-based compensation structure was *per se* unlawful.

Instruction #2 deals with the status of the special fraud alerts. This is where Marchetti's arguments stemming from *United States v. Christo*,

---

[13] It is unclear, from the record, where and even whether this instruction was withheld or given. We assume *arguendo* that it was withheld.

614 F.2d 486, 488 (5th Cir. 1980), are most applicable. In that case, the jury instruction explicitly linked violations of a civil regulation to violations of the criminal law under which the defendant was indicted. *See id.* at 490–91. The court concluded that "[a] conviction, resulting from the government's attempt to bootstrap a series of checking account overdrafts, a civil regulatory violation, into an equal amount of misapplication felonies, cannot be allowed to stand." *Id.* at 492.

But this situation is much different. First, the "non-binding Fraud Alerts" and other complained-of pieces of evidence do not appear to be referenced in the jury instructions, as they were in *Christo*. Second, they were relevant for other legitimate purposes, such as establishing the state of mind of the defendants. Indeed, the district court was quite careful to avoid the confusion that occurred in *Christo*. Taken together, these facts make applying *Christo* inappropriate in this circumstance.

Nor was failing to give this instruction otherwise an abuse of discretion. The court, *inter alia*, gave the instruction recounted in the footnote.[14] We would be hard-pressed to say that failing to do so in a preliminary instruction "seriously impairs the defendant's ability to present effectively a partic-

---

[14] The court said,

Ladies and gentlemen of the jury, I do want to provide a little bit of an instruction. You've heard some evidence from the witness, and you may hear other evidence from other witnesses, regarding civil statutes, rules and regulations. I do want to caution you that a violation of a civil statute or rule or regulation is not a crime. This is not a civil case, and the defendants are not on trial for a civil violation or for medical malpractice. Even if you find that a defendant violated the applicable civil statutes, rules or regulations, that alone in and of itself would not be a criminal violation. However, civil statutes and rules and regulations may be relevant to determining whether a defendant acted with criminal intent. That is, knowingly and willingly or with a specific intent to violate the law, in this case in particular, the Anti-Kickback Statute.

ular defense." *Lucas*, 516 F.3d at 324.

Instruction #3 was an oral request: "We ask the Court to instruct the jury that a percentage-based compensation structure to compensate individuals for performing sales and marketing services is not, per se, unlawful." Refusing to do this was also not an abuse of discretion.

On the first prong, Marchetti is right that it is legally correct to say that percentage-based compensation structures are not *per se* unlawful. Our caselaw makes that clear. But this request fails the second prong. Although the instructions say nothing about *per se* unlawfulness or percentage-based compensation, they are quite clear that the payments have to be made in order to induce an unlawful referral. That requires proof beyond showing that a percentage-based compensation contract existed.

The third prong is also enough to affirm under *Lucas*. In closing argument, Marchetti's defense was allowed to contend that "an arrangement based upon activity-based can be compliant with the Anti-Kickback Statute, and you can also have an arrangement based upon percentage of collections." The government promptly objected. But Marchetti's counsel appears to have proceeded. *Lucas* asks whether the instruction "concerns an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense." *Id.* This is certainly "an important point in the trial," but where defense counsel appears to have been able to argue essentially the same thing in closing, it is hard to say that failure to give the instruction "seriously impair[ed] the defendant's ability to present effectively a particular defense." *Id.*

In short, the district court did not abuse its discretion in failing to give any of Marchetti's proposed instructions.

No. 22-40617

IV.

Next, we ask whether the district court abused its discretion when it submitted the government's version of a "good faith defense" instruction. It did not. The standard of review is the same as for the issue addressed in Section III.

Marchetti's requested instruction was as follows:

> The good faith of a Defendant is a complete defense to the charges of the Indictment. This is because good faith on the part of a Defendant is inconsistent with the finding of willfulness that is required to convict a Defendant of conspiracy to commit illegal remunerations. These laws are intended to subject to criminal punishment only those people who knowingly and willfully act to violate the law.

> A Defendant is not required to prove good faith. The Government must prove a Defendant's knowing and willful conduct beyond a reasonable doubt. An honestly held opinion or an honestly formed belief cannot constitute knowing and willful conduct—even if the opinion or belief is mistaken. Similarly, evidence of a mistake in judgment, an error in management, or carelessness cannot establish knowing and willful conduct. In determining whether or not the Government has met its burden to prove that a Defendant acted knowingly and willfully, the jury must consider all of the evidence in the case bearing on a Defendant's state of mind.

> If the evidence in the case leaves the jury with a reasonable doubt as to whether a Defendant acted in good faith, the jury must find that Defendant not guilty.

The instruction given at trial was as follows:

> If you find that a defendant acted in good faith, then he lacked the willfulness required to prove the offense of conspiracy to commit illegal remunerations charged in Count 1. A defendant does not have to prove his good faith. Rather, the

22

government must prove beyond a reasonable doubt that the defendant acted willfully as charged in Count 1.

A defendant does not act in good faith if he knowingly made false or fraudulent representations or promises or *otherwise acted with the intent to defraud or deceive another* in connection with the Anti-Kickback Statute as charged in Count 1.

(Emphasis added.)

The government first maintains that the court need not provide an instruction on good faith defense "where the defense is substantially covered by the charge given and the defendant has had the opportunity to argue good faith to the jury." The cases the government cites are not applicable, because they deal with situations where no good faith instruction was given.[15] But here a good faith instruction *was* given, and Marchetti argues it is legally erroneous. Surely, the government's lack of an obligation to provide a good faith instruction in every case does not absolve it from responsibility where it provides a legally erroneous one. In that case it would be unlikely the charge as given would "substantially cover[]" the defense. *Cf. Upton*, 91 F.3d at 683.

Marchetti takes three issues with the instructions as given. First, he objects to the "otherwise acted with the intent to defraud or deceive" language. But the government correctly points out that this is immediately qualified by "in connection with the Anti-Kickback Statute as charged in Count 1." This cuts the legs out from under Marchetti's concern. The government must prove fraud in connection with the AKS scheme being charged, not, as Marchetti puts it, things that "[weren't] even 'in connec-

---

[15] *See United States v. Upton*, 91 F.3d 677, 683 (5th Cir. 1996); *United States v. Brooks*, 681 F.3d 678, 705 n.22 (5th Cir. 2012).

tion' with the AKS."

In particular, Marchetti avers that the instruction allows the jury to consider what he claims is a negligent action (the submission of the "Chipotle Report") as proof of the *mens rea* required here, "willfulness." Marchetti's theory lacks merit. First, if it was negligent, it does not fall within "intent to deceive." Second, nothing in the instruction can be read (as Marchetti seems to suggest) to allow negligence to substitute for the proper *mens rea* of willfulness.

Second, Marchetti objects that the instruction was improperly "truncated." But it's unclear what was truncated. The only other reference to an omission is one to which Marchetti agreed and the government did not. Either way, the central objection to the "truncation" is that the instruction did not substantially cover the good faith defense. But that bar is low. As noted above, it is often the case that instruction on "knowingly" and "willfully" is sufficient to cover the defense. *See Upton*, 91 F.3d at 683. Given that the jury not only was instructed on this *mens rea* requirement, but also was given a legally correct good faith defense instruction, the instruction clears the low bar.

Third, Marchetti objects that the instructions "constructively amend-[ed] the superseding indictment." "A constructive amendment occurs . . . when the Government is allowed to prove an essential element of the crime on an alternative basis permitted by the statute but not charged in the indictment." *United States v. Vargas*, 6 F.4th 616, 621 (5th Cir. 2021) (citation and internal quotation marks omitted). Marchetti posits that he was indicted for conspiracy to commit an offense and not conspiracy to defraud. Consequently, he says that the additions of "otherwise acted with the intent to defraud or deceive" allows him to be convicted on something not charged in the indictment. The government retorts that "the good faith instruction did

not permit the jury, to convict Marchetti for defrauding the United States," but instead, "Marchetti's deceptive conduct proved that he was not acting in good faith and served as evidence that Marchetti acted willfully."

The government has the better of this dispute. The good faith instruction speaks to willfulness, not to the underlying conduct. Even the passage Marchetti points out as "exploiting the flawed instruction in [the government's] closing" supports the government's point. The government was quite clear: "[G]ood faith affects the culpable mental state of the defendant and can impact willfulness of conduct." This does not constitute a constructive amendment.

## V.

Marchetti's final objection to his conviction is that he is entitled to a new trial because of cumulative error. The bar for cumulative error is exceedingly high: "[T]he cumulative error doctrine . . . provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Delgado*, 672 F.3d 320, 343–44 (5th Cir. 2012) (en banc) (quoting *United States v. Munoz*, 150 F.3d 401, 418 (5th Cir. 1998)) (alterations in original). But "[c]umulative error justifies reversal only when errors so fatally infect the trial that they violated the trial's fundamental fairness. We have repeatedly emphasized that the cumulative error doctrine necessitates reversal only in rare instances and have previously stated en banc that the possibility of cumulative error is often acknowledged but practically never found persuasive." *Id.* at 344 (cleaned up).

Marchetti has not shown any reversible error—let alone any non-reversible error. This case does not meet the extreme requirements of the cumulative-error doctrine.

## VI.

Finally, we turn to whether the district court incorrectly applied the sentencing guidelines to Marchetti.

"Where a defendant preserves a procedural sentencing error, such as a Sentencing Guidelines calculation, by objecting before the district court, we review the sentencing court's factual findings for clear error and its interpretation or application of the guidelines de novo. . . . If established, such error shall nevertheless be disregarded if it is harmless . . . ." *United States v. Randall*, 924 F.3d 790, 795 (5th Cir. 2019) (citations omitted).

Marchetti was sentenced under U.S.S.G. § 2B4.1(b)(1)(b), which provides,

> (1) If the greater of the value of the bribe or the improper benefit to be conferred . . . exceeded $6,500, increase by the number of levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

Marchetti's sentence was based on the value of the bribe (the higher of the two values). Relying on *United States v. Ricard*, 922 F.3d 639, 657 (5th Cir. 2019), Marchetti appears to challenge the "value of the improper benefit conferred." But that is immaterial: He was sentenced per the value of the bribe.

As with the conviction, there is no error in the sentence.

AFFIRMED.