# United States Court of Appeals
# for the Fifth Circuit

---

No. 23-40586

CONSOLIDATED WITH

No. 24-40002

---

United States Court of Appeals
Fifth Circuit

**FILED**

May 20, 2025

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

STEVEN DONOFRIO,

*Defendant—Appellant*.

---

Appeal from the United States District Court
for the Eastern District of Texas
USDC Nos. 5:19-CR-25-5

---

Before HO, ENGELHARDT, and DOUGLAS, *Circuit Judges*.

PER CURIAM:[*]

Steven Donofrio was convicted of one count of violating 18 U.S.C. § 371, conspiracy to commit and abet certain offenses in violation of 42 U.S.C. § 1320a-7b, the Anti-Kickback Statute. He now appeals that conviction on numerous grounds, as well as his sentence and forfeiture judgment. For the reasons that follow, we AFFIRM the district court's

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

judgment of conviction. We VACATE Donofrio's sentence and forfeiture judgment and REMAND for further proceedings.

## I

The Anti-Kickback Statute ("AKS") prohibits knowingly and willfully soliciting or receiving kickbacks, bribes, or rebates, directly or indirectly, in return for referring an individual for the furnishing of services or ordering any good, facility, or service that may be covered by a federal health care program. 42 U.S.C. § 1320a-7b(b)(1). It also prohibits any individual from offering or paying any such remuneration. *Id.* § 1320a-7b(b)(2); *see also United States v. Marchetti*, 96 F.4th 818, 825 n.6 (5th Cir. 2024) ("The [§ 1320a-7b(b)](1)/(2) distinction appears to be purely about the direction the money is flowing."). Medicare is a qualifying health care program under the statute. 42 U.S.C. § 1320a-7b(f).

## A

Vantari Genetics, LLC ("Vantari"), was a medical laboratory that performed pharmacogenetic tests ("PGx"), swab tests that identify how patients metabolize drugs. In 2014, its founder, Nicolas Arroyo, sought to grow the company's reach and profitability by entering the Texas and Arizona markets. Vantari's business model worked as follows: a contracted distributor would market Vantari's product to doctors; once a doctor selected Vantari, they would swab the patient; the doctor would then package the swab and ship it to Vantari's laboratory in Irvine, California, using a prepaid UPS label that came with the swab. Once the insurer was billed, Vantari would pay each distributor a percentage of reimbursements generated by the distributor, some of which was then paid by the distributor to its sub-representatives.

As part of its expansion plan, Vantari approached Genematrix, a healthcare distributor that had recently been founded by Donofrio. Donofrio,

hoping to grow Genematrix, considered this "a huge opportunity." He tasked his attorney, Clay Patterson, with reviewing and assisting with the contract, but Patterson raised red flags regarding compliance with applicable regulations. Donofrio—who had experience in the medical field, had received AKS training, and was known as a "smart" and "seasoned" healthcare professional—also noticed some concerning language in the contract. On April 15, 2014, he emailed Arroyo, stating: "Is there someone else I should be handling this with on your side? I don't want this to be a huge roadblock, but your contract did have a lot of red flags with regards to Medicare compliance. We probably need to have a call. Let me know." Nevertheless, the concerning language remained.

Once again, Patterson informed Donofrio of red flags: the agreement "fail[ed] to include necessary compliance language for AKS" and "contain[ed] multiple provisions . . . in direct contradiction of Medicare Regulations." "Strictly from a legal" perspective, Patterson "strongly recommend[ed] against signing the Agreement"; however, "from a business" perspective, he understood "the need to enter the contract" and recommended doing so if his revisions were accepted.

Donofrio signed the agreement. He responded to Patterson, stating that he agreed with his assessment, but that Genematrix was "a ship without a port right now" and that "[t]his may just be a temporary stop for [the company]." He emailed the agreement to Arroyo with the following transmittal language: "As I stated to you yesterday after our discussion, I made it clear to our attorney to stress business over legal." He later testified that he believed the contract was legal and that Patterson was comfortable with the agreement. The contract provided for a thirty-five percent commission on reimbursements for all insurance payors.

3

23-40586
c/w No. 24-40002

The contract was a success.  Genematrix received over $2.4 million in payments as Donofrio and Arroyo established a lasting working relationship and, ultimately, friendship.  Donofrio's involvement transcended mere distributorship, at least from an outsider's perspective—he was even provided a Vantari domain email address and business card.  But, in due time, the agreement hit speedbumps.  Vantari's Chief Financial Officer sent an advisory opinion from the Department of Health and Human Services' Office of Inspector General suggesting that Vantari's arrangements with distributors were "essentially illegal."  Arroyo amended the contracts such that they only provided commissions for private payors, but incorporated new language that would pay a specified monthly rate for each "active" sub-representative who performed certain activities.  The contract explicitly stated that there would be no commissions for federal reimbursements.

This concerned Arroyo, whose business depended on large distributors earning federal commissions.  He called Donofrio and explained the issue, and ultimately decided he would "find ways to pay for those federal claims one way or another."  He "tried everything in [his] power" to fix the issue, and informed "a handful of distributors, the largest ones, . . . that [he] would do everything in [his] power, . . . to try to shore up those differences."  Donofrio, for his part, attempted to settle down his employees who had grown concerned and restless.

Ultimately, Arroyo found two ways to cover the lost federal reimbursement commissions.  First, he paid lump sum "bonuses" to distributors for compliance training and contract signing.  Arroyo testified that these bonuses were designed to cover lost federal reimbursements.

Second, he implemented a "matching" process.  Every month, a Vantari employee would work with distributors to report the number of "active reps" that were necessary to match the would-be federal

reimbursements. This was "a sham" to cover federal reimbursements while "being compliant" with the AKS. The method was designed to cover any enforcement inquiries. Donofrio testified that he was unaware that the contracts were changed for compliance reasons, and instead merely went along with Vantari's changes to ensure he got paid.

Testimony at trial was conflicting. Some shows that Donofrio spoke with Arroyo regarding this plan monthly, understood its purpose, believed it was unlawful, and was involved in submitting activity reports in accordance with the matching scheme. One email from Donofrio included a list of sixty-five representatives to "see where this gets us," which Arroyo confirmed was "in response to [him] letting [Donofrio] know that [Vantari was] not going to be able to reimburse anybody outside of those active contractors." Another email shows Donofrio telling his employees: "Need 50 people on this form with basic work descriptions. Randomly assign these job duties. . . . They won't pay us until we do so. This is a priority. . . . Implementation coordination, sales and marketing, swabbing, sales and office training."

But Donofrio testified that he "never" included false statements in a monthly activity report; "never" reported something that he did not do; was not aware of any false statements in Genematrix reports; and that "nothing" changed about his interactions with Vantari upon the signing of the activity-based contract. While he admitted that he continued receiving federal commissions, he claimed that it showed no more than a breach of contract, and that it was "absolutely not" his intent to violate the law.

Eventually, Arroyo created a shell entity, KNM Global, LLC, to cut out two Vantari partners and "compensate [himself] above and beyond outside of the corporation," or, in other words, "steal[] from [his] own corporation." KNM's described purpose was to "offer consultive services, marketing, [and] training" but, in reality, it "didn't do a single thing."

Instead, Arroyo would, through Vantari, send fifty percent commissions to one of its distributors, which would spin the additional fifteen percent off to KNM.

Fearful that the new KNM scheme was too profitable and would raise regulatory red flags, Arroyo created Codon DX Services, LLP ("Codon") and hired a friend to lead the company. Codon then teamed up with a Vantari competitor, Althea, after Donofrio introduced Arroyo to Althea's CEO. Arroyo developed a scheme in which Codon packaged Althea test swabs in kits with Vantari forms. Medical providers, believing that they ordered a Vantari test, would instead unknowingly use an Althea test swab. The medical providers would then send the Althea test and Vantari forms to a distribution center in Tempe, Arizona.

At the distribution center, a Codon employee divided the tests into those billed to private insurance and those billed to Medicare. If the test was billed to private insurance, they would forward it to the Vantari lab. But if it was billed to Medicare, they would repackage the test to resemble one from Althea and ship it to Althea's lab. Althea would then pay Codon a fifty percent commission on the Medicare reimbursements. Through this scheme, Codon acted as a conduit for Medicare reimbursements after Vantari's cessation of such activity, providing a way to "continue to get non-government tests through the door" while also "redirect[ing] government payors down to Althea so the distributors would be fulfilled from their perspective."[1]

Arroyo's girlfriend, Jessica Conn, worked on this project. Her duties existed almost exclusively when Medicare reimbursement orders were

_____

[1] Arroyo ensured that Vantari could perform PGx tests on Althea swabs at its Irvine lab.

delivered, in which case she would transcribe physician-provided information from Vantari forms to Althea forms. The forged forms were then sent to the Althea lab with the swab.

Once again, testimony regarding Donofrio's knowledge of and involvement in Codon's activity was conflicting. Arroyo's other partner at Codon, Sean Parrish, testified that he spoke with Donofrio about Codon, and that Donofrio was made aware that some Vantari partners were excluded from Codon's creation. Arroyo testified that he informed Donofrio that requisition forms were being switched. And emails show his involvement: Donofrio was included on an email from Arroyo asking when it would be time to "start sending Althea tests to Tempe" and stating that "[o]ur girl Jessica will be trained tomorrow so we can start as early as then."[2] Donofrio separately sent Arroyo a "cheat sheet" on Althea paperwork, informing Arroyo that if he "need[ed] more direction for our girl in Phoenix, he would "have her speak to [his] best guy in Florida." The "cheat sheet" demonstrated how to fill out Althea forms. Nonetheless, at trial, Donofrio maintained that he still did not believe that forms were ever switched.

Althea and Codon's agreement provided for fifty percent commissions to Codon on Medicare collections. Codon would then pay either Vincent Marchetti—a co-conspirator from another distributor—or Donofrio. Early in the scheme, because Parrish was concerned about money initiating at Codon, they "put Genematrix in the middle of it as an intermediary to receive the money, and then [Codon] received the money from them."[3]

_____

[2] This email was sent from Arroyo's Vantari email address, and Donofrio's Vantari email address was cc'd.

[3] Throughout the operation, the money was not funneled through Vantari.

The scheme worked well, apart from one hiccup: Althea's vice president, Noah Nasser, emailed Donofrio about an incomplete requisition form; upon calling the physician's office, Nasser learned that the physician had filled out a Vantari form, not an Althea form. Nasser had several questions: Were they using Althea or not? Why do the signatures not match on the Vantari and Althea forms? Was the patient swabbed twice? Does this issue extend beyond one patient? Donofrio responded that he could not imagine double swabbing, which Nasser called "reprehensible." Donofrio forwarded the exchange to Arroyo, stating: "Need to know what's going on or what they think is going on." Donofrio maintains that this demonstrated his courage to confront Arroyo and proves his innocence.

Genematrix received payments from Codon from August 2015 through January 2016.

B

In 2021, Donofrio was charged in the Eastern District of Texas pursuant to a twelve-defendant superseding indictment with conspiracy to commit illegal remunerations. The indictment alleged that Donofrio conspired with Arroyo and others to violate the AKS, with the goal of "unlawfully enrich[ing] themselves by paying and receiving kickbacks in exchange for the referral of and arranging for health care business for which payment may be made in whole or in part under the Medicare program," as well as concealing the scheme and using proceeds for personal benefit. The indictment incorporated activity from both Vantari and Codon.

Donofrio pleaded not guilty and was jointly tried with Marchetti and Dr. Ray Ng. After the first trial, Dr. Ng was found not guilty, Marchetti was

23-40586
c/w No. 24-40002

found guilty,[4] and no verdict was entered for Donofrio. The court declared a mistrial as to Donofrio, and he was retried. At his retrial,[5] Donofrio testified and orally moved for a judgment of acquittal, which the district court denied. The jury returned a guilty verdict. Donofrio renewed his motion for judgment of acquittal, which the court again denied.

At sentencing, Donofrio objected to the presentence report and value of the bribe determination under U.S.S.G. § 2B4.1. The court overruled the objection. The parties stipulated to a forfeiture amount, but Donofrio retained his right to appeal the judgment. He was sentenced to forty-two months' imprisonment and a forfeiture judgment of $769,000. This appeal followed.

Donofrio challenges his conviction, sentence, and forfeiture judgment. He first raises three procedural arguments: (1) Codon was a separate conspiracy which was improperly joined; (2) venue was improper because no overt act took place in the Eastern District of Texas; and (3) the jury was instructed that only Vantari conduct was to be considered, and so Codon conduct could not contribute to his conviction.

He then raises the following merits-based challenges: whether (1) the Government proffered sufficient evidence to sustain the conviction; (2) the district court abused its discretion in the construction of its willfulness and

---

[4] Marchetti appealed his conviction. A panel of this court upheld the conviction, relying on his participation in the Codon conduct. *United States v. Marchetti*, 96 F.4th 818, (5th Cir. 2024). We found that his participation in the Vantari conduct was insufficient on its own to sustain a conviction because it was not unlawful under the AKS. *Id.* at 826–27 (noting that "the structure of the contract alone [was] not sufficient evidence to produce a conviction under the AKS," and therefore could not lay the predicate for a conspiracy, and that the Government failed to show Marchetti's influence over relevant decisionmakers).

[5] Donofrio's retrial occurred before we issued our opinion in *United States v. Marchetti*.

advice-of-counsel jury instruction; (3) the district court abused its discretion in excluding allegedly exculpatory witnesses; (4) the district court abused its discretion in excluding allegedly exculpatory evidence; (5) the district court erred in calculating the value of the bribe under relevant Sentencing Guidelines; and (6) the district court erred in valuing the forfeiture judgment.

## II

We first review Donofrio's procedural challenges.

## A

Donofrio first argues that the joinder of the Vantari and Codon conduct raises three issues: (1) that Codon was a separate conspiracy which was improperly joined; (2) that venue was improper because no overt act took place in the Eastern District of Texas; and (3) that the jury was instructed that only Vantari conduct was to be considered.

## 1

Donofrio contends that the Vantari and Codon conduct represented two separate conspiracies, which he argues is supported by the fact that the defendants located in Texas are unrelated to both Donofrio and Codon. He also highlights the distinguishable elements between the Vantari conduct and the Codon conduct. Whether the evidence supports a finding of a single conspiracy is a question of fact for the jury. *United States v. Warren*, 986 F.3d 557, 562–63 (5th Cir. 2021) (quoting *United States v. Beacham*, 774 F.3d 267, 273 (5th Cir. 2014)). "The jury's finding must be affirmed 'unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt.'" *Id.* at 563 (quoting *Beacham*, 774 F.3d at 273). Three considerations are relevant to this determination:

23-40586
c/w No. 24-40002

"(1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlapping of the participants in the various dealings." *Id.* (quoting *Beacham*, 774 F.3d at 273).

Donofrio's identifications of the separate conspiracies are muddled— at times, he differentiates Vantari conduct from Codon conduct; at others, he differentiates the defendants located in Texas from the other defendants. Regardless, all were properly joined.

a

Donofrio challenges that the Codon conduct did not involve some defendants, did not involve inducements or payments to doctors, and was unrelated to Vantari or its payments. Instead, he frames the Codon conduct as a separate conspiracy "to redirect Medicare business—physician referrals for Vantari *from* Vantari to Althea—via Jessica Conn's secretive transcriptions of requisition forms." He relies on the fact that Codon was formed six months after Genematrix contracted with Althea and that there was no evidence that a physician who was marketed to by Vantari had a requisition form switched.

Donofrio's hyper-specific definition of the conspiracy's goal runs contrary to our precedent. We "interpret[] the 'existence of a common goal' broadly." *United States v. Shah*, 95 F.4th 328, 361 (5th Cir. 2024) (quoting *Beacham*, 774 F.3d at 273). In *Shah*, we recognized that "[a] common pursuit of personal gain is sufficient." *Id.* This is "a low hurdle." *Warren*, 986 F.3d at 563. Arroyo worked with Donofrio, among others, to profit off of Medicare reimbursements. When the initial contracts were deemed to be potentially unlawful, he found other ways to compensate individuals for federal reimbursements. That the method shifted from falsified activity reports to repackaging Althea tests and altering test requisition forms based on insurer is not persuasive to show separate conspiracies. As Arroyo himself put it,

11

23-40586
c/w No. 24-40002

KNM and its subsequent evolution, Codon, were a means to siphon off additional Medicare funds.  Therefore, the two schemes shared a common goal.[6]

b

The next question examines the nature of the schemes.  As an initial matter, other defendants received commissions on Medicare reimbursements similar to Donofrio, and did so through activity-based contracts.  Universal Medical Testing ("Universal"), which employed co-defendants Timothy Armstrong and Virginia Herrin, was headquartered in Frisco, Texas.  And they "understood that this activity payment and the way it was being calculated was simply a cover for paying on volume or value of federal business."  Similar to Genematrix, Universal received a lump sum bonus for the "outstanding balance of unpaid commissions."

Second, the co-defendants all exercised influence over physicians' decision-making.  Donofrio and Marchetti were involved in rerouting patient samples to Althea.  Armstrong paid physicians to work with Vantari, or otherwise gifted items of great value.  Herrin paid a physician's spouse for the physician's use of Vantari tests.  The methods were undoubtedly different.  But "if the 'activities of one aspect of the scheme are necessary or advantageous to the success of another aspect[,]' then that supports a finding

_____

[6] Donofrio cites *Kotteakos v. United States*, 328 U.S. 750, 754–55 (1946), for the proposition that multiple, separate conspiracies existed.  But *Kotteakos* is distinguishable.  There, the court was provided "proof show[ing] distinct and separate [conspiracies] connected only by the fact that one man . . . was a participant and key figure in all." *Blumenthal v. United States*, 332 U.S. 539, 547 (1947).  "There was no drawing of all [conspiracies] together in a single, over-all, comprehensive plan." *Id.* at 558.  In contrast, in *Blumenthal*, the parties, "[b]y their separate agreements, . . . became parties to the larger plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal." *Id.*  Such was the same in *Shah*, 95 F.4th at 362, and such is the same here.

12

of a single conspiracy." *Shah*, 95 F.4th at 361 (quoting *Beacham*, 774 F.3d at 274). A common nature may exist "where there are several parts inherent in a larger plan." *United States v. Morris*, 46 F.3d 410, 416 (5th Cir. 1995).

Arroyo's overarching plan depended on his largest distributors. And, like Donofrio, Armstrong and Herrin were executives of some "of the largest distributors that [Arroyo] worked with," and they operated out of "East Texas." The activities of distributors in Texas supported and advantaged the greater conspiracy.

c

Finally, we must ask whether "the memberships of [the] two criminal endeavors overlap." *United States v. Richerson*, 833 F.2d 1147, 1154 (5th Cir. 1987) (quoting *United States v. Elam*, 678 F.2d 1234, 1246 (5th Cir. 1982)). We ask whether "a 'key man' is involved in and directs illegal activities, while various combinations of other participants exert individual efforts toward a common goal." *Id.* (quoting *Elam*, 678 F.2d at 1246).

Arroyo was the key man in these schemes: he founded Vantari and Codon; he contracted with Donofrio and other distributors, and he concocted the false activity report plan. He created Codon to conceal certain activity and increase Medicare reimbursement commissions, and he conducted the necessary legwork to ensure that Vantari and Althea could operate on identical swabs. In other words, Arroyo was the linchpin of the scheme. His testimony and the facts demonstrate as much.

With all three factors suggesting that the conspiracies were properly considered together, we consider venue.

2

Donofrio asserts that he was improperly charged in the Eastern District of Texas. When determining whether venue is proper, we ask

13

whether no rational jury could have found venue by a preponderance of the evidence. *United States v. Kiekow*, 872 F.3d 236, 243 (5th Cir. 2017). Donofrio cites that the fulfillment center in question was in Arizona and all involved individuals lived in either California or Arizona. With respect to Herrin, a co-conspirator who is also a resident of the Eastern District of Texas, Donofrio claims that she never spoke to him, had nothing to do with Codon or Althea, and did not violate the AKS.[7]

As an initial matter, that Herrin was not convicted of an AKS violation—or conspiracy to commit one—is irrelevant.[8] Individuals need not all contribute in the same way or amount. *See Morris*, 46 F.3d at 416 (stating that it is permissible for a conspiracy to have "several parts inherent in a larger common plan"). And Herrin was indicted alongside Donofrio for the same crime; she merely pled guilty to a lesser crime.

It is equally as irrelevant that she did not personally know Donofrio. Indeed, "[a]n individual 'need not know all the details of the unlawful enterprise or . . . the exact number or identity of all the co-conspirators' in order to be liable as a co-conspirator." *United States v. Chapman*, 851 F.3d 363, 378 (5th Cir. 2017) (quoting *United States v. Brown*, 727 F.3d 329, 339 (5th Cir. 2013)); *see also United States v. Lokey*, 945 F.2d 825, 833 (5th Cir. 1991) ("[E]ven assuming appellants did not know each other, there is sufficient overlap of personnel if a pivotal figure . . . directs and organizes the illegal activity, and has extensive dealings with each of the parties."). In other words, that Herrin only ever met Donofrio once—in California, not

---

[7] These assertions mischaracterize Herrin's testimony, in which she explained that she had met Donofrio once before.

[8] Herrin pled guilty to falsifying documents.

Texas—and never agreed with him specifically to commit any illegal act, is irrelevant to the inquiry. She did not even need to know of his existence.

Instead, the question is merely whether *any* overt act occurred or agreement formed in the Eastern District of Texas. *Kiekow*, 872 F.3d at 243. "An overt act is an act performed to effect the object of a conspiracy." *Id.* Herrin's and Armstrong's payments to healthcare professionals to use Vantari products certainly qualify as overt acts, and it all took place in the Eastern District of Texas: Herrin's company was addressed in Frisco, Texas, which is in the District; she worked with a physician in the District; her Vantari contract notes her address in the District; and the check she sent to a physician's spouse in exchange for use of Vantari tests bore the Frisco address. Considering this evidence in the light most favorable to the Government, as we must, *id.*, a rational jury could conclude that the Government established venue by a preponderance of the evidence.

3

Finally, Donofrio argues that the Codon conduct could not have been involved in the jury's determination because the jury instruction required a finding that Donofrio engaged in a conspiracy specifically related to Vantari. In other words, he claims that in the jury instructions for substantive violations of the AKS, the second element required a finding beyond a reasonable doubt "[t]hat the remuneration was solicited or received in return for referring an individual *to Vantari* for the furnishing or arranging for the furnishing of an item or service, or for arranging for or recommending the ordering of an item or service." He claims that, because the Vantari conduct is insufficient on its own under *Marchetti*, and because the Codon conduct was not incorporated in the jury instructions, the conviction must be reversed.

15

First, contrary to Donofrio's assertions, the superseding indictment explicitly incorporated the Codon conduct. And while jury instructions may, at times, narrow an indictment, *see, e.g.*, *United States v. McGilberry*, 480 F.3d 326, 331–32 (5th Cir. 2007); *United States v. Griffin*, 800 F.3d 198, 201–03 (5th Cir. 2015), there is no indication that the court sought to narrow it, *see, e.g.*, *Griffin*, 800 F.3d at 203 (redacting the indictment).[9] Accordingly, the jury instructions did not narrow the indictment.

Second, the jury instructions only discussed Vantari when discussing the requirements for a substantive violation of the AKS. Vantari was *not* listed as a necessary element under the conspiracy charge. And, again, the indictment incorporated the Codon conduct in the factual resume within the superseding indictment. It is true that we should not collapse conspiracy and substantive violations of the AKS, and, here, the unlawful objective "is a

---

[9] Indeed, it is questionable whether jury instructions would "narrow" an indictment in this case at all absent an affirmative act demonstrating such a desire. In each of *McGilberry* and *Griffin*, the indictment was independently problematic. *See McGilberry*, 480 F.3d at 331–32 (jury instructions "correctly stated a grounds for conviction under [18 U.S.C. § 924]" despite indictment's erroneous charge of simple possession); *Griffin*, 800 F.3d at 201–02 (considering an indictment that charged Griffin with defrauding two banks, one of which was not included in his scheme). Here, the jury rendered a guilty verdict "[a]s to Count 1 of the First Superseding Indictment." Count 1 read as follows: "[T]he defendants . . . knowingly and willfully conspired and agreed with Nicolas Arroyo and others, both known and unknown to the Grand Jury, to commit and abet certain offenses against the United States" to violate the AKS in any of four ways enumerated under 42 U.S.C. §§ 1320a-7b(b)(1)(A), (b)(1)(B), (b)(2)(A), and (b)(2)(B). Vantari was not named as a condition precedent. Instead, the jury instruction relating to this count required the following three findings: (1) "That the defendant and at least one other person agreed to commit the crime of illegal remunerations, as charged in the First Superseding Indictment"; (2) "That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose"; and (3) "That at least one of the conspirators during the existence of the conspiracy knowingly committed at least one of the three overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy." Not only are there no indicia of narrowing efforts, but the language is broad and the indictment is pasted into the instructions.

substantive violation of the AKS." *Marchetti*, 96 F.4th at 826 n.9. But because the Codon and Vantari conduct were two parts of the same conspiracy, *Donofrio*'s Vantari conduct need not have violated the AKS, so long an overt act in furtherance of the unlawful objective occurred in the greater conspiracy and Donofrio joined the conspiracy by voluntarily agreeing to pursue the unlawful objective.

Third, the complained-of jury instruction is disjunctive. The instruction read that one element of the substantive violation was "[t]hat the remuneration was solicited or received in return [(1)] for referring an individual to Vantari for the furnishing or the arranging for the furnishing of an item or service, *or* [(2)] for arranging for or recommending the ordering of an item or service." This second clause makes no mention of Vantari and implicates 42 U.S.C. §§ 1320a-7b(b)(1)(B) and (b)(2)(B), both of which the Codon conduct violated.[10] This tracks with the superseding indictment, which only incorporates Codon activity for violations of these sections. On this basis, the jury instruction was not in error.[11]

---

[10] This disjunctive reading directly follows the statutory language. Sections (b)(1)(A) and (b)(2)(A) cover the referral of an individual for the activities encompassed in the first clause. Meanwhile, §§ (b)(1)(B) and (b)(2)(B) cover the arrangement or recommendation of goods or services, the activities encompassed by the second clause.

[11] Even if the instructions were ambiguous and had a "tendency to confuse or mislead the jury with respect to the applicable principles of law," *United States v. Branch*, 46 F.3d 440, 442 n.2 (5th Cir. 1995) (per curiam), such an instruction is not plain error unless "there is a likelihood of a grave miscarriage of justice." *United States v. McClatchy*, 249 F.3d 348, 357 (5th Cir. 2001) (quoting *United States v. Sellers*, 926 F.2d 410, 417 (5th Cir. 1991)). A grave miscarriage of justice exists if the instruction "could have meant the difference between acquittal and conviction." *McClatchy*, 249 F.3d at 357. Alternatively, an instruction may be error if it "was ambiguous and . . . there was 'a reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime beyond a reasonable doubt." *Waddington v. Sarausad*, 555 U.S. 179, 190–91 (2009) (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)). But the instruction made no such impact on the Government's burden. After all, the jury instruction "may

17

23-40586
c/w No. 24-40002

III

A

Having determined that the preliminary matters above do not warrant reversal, we review the sufficiency of the evidence. Because Donofrio timely moved for a judgment of acquittal, we review his sufficiency challenge de novo. *United States v. Jimenez-Elvirez*, 862 F.3d 527, 533 (5th Cir. 2017). However, we grant "substantial deference to the jury verdict," *United States v. Delgado*, 672 F.3d 320, 330 (5th Cir. 2012) (en banc), meaning that affirmance is appropriate "if a reasonable juror could conclude that the elements of the crime were established beyond a reasonable doubt." *United States v. Evans*, 892 F.3d 692, 702 (5th Cir. 2018). The evidence is viewed "in the light most favorable to the verdict," and we must draw "all reasonable inferences from the evidence to support the verdict." *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007) (quoting *United States v. Ragsdale*, 426 F.3d 765, 770–71 (5th Cir. 2005)). Jurors' credibility

---

not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Id.* (quoting *Estelle*, 502 U.S. at 72). "Because it is not enough that there is some 'slight *possibility*' that the jury misapplied the instruction, the pertinent question 'is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Id.* (first quoting *Weeks v. Angelone*, 528 U.S. 225, 236 (2000), and then quoting *Estelle*, 502 U.S. at 72).

Here, it cannot be said that the jury instruction violated Donofrio's due process rights. Considering the jury instructions as a whole, the conspiracy charges did not distinguish between the Vantari or the Codon conduct. Nor does the trial record demonstrate a focus exclusively upon the Vantari conduct. Indeed, testimony shows Donofrio's involvement in the Codon activity, as well as its illegality. And, finally, a review of the indictment—part of the trial record—demonstrates that the allegedly erroneous instruction did not "infect[] the entire trial." *Id.* (quoting *Estelle*, 502 U.S. at 72). The Government was still required to demonstrate each element of the *charged* crime. The instruction was not erroneous.

18

determinations should be left untouched. *United States v. Gibson*, 875 F.3d 179, 185 (5th Cir. 2017).

B

To convict a defendant of conspiracy to commit illegal remunerations, the Government must prove:

> (1) an agreement between two or more persons to pursue [the] unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy.

*Marchetti*, 96 F.4th at 824 (quoting *United States v. Barnes*, 979 F.3d 283, 295 (5th Cir. 2020)) (alteration in original). We consider these factors below.

1

First, pursuit of an unlawful objective. Donofrio largely relies on *Marchetti* to argue that his Vantari conduct does not rise to the level necessary to convict him of conspiracy to violate the AKS. Marchetti engaged in much of the same Vantari activity as did Donofrio, including receiving assurances from Arroyo that alternative routes of compensation would be utilized after concerns about the legality of the initial contract were raised. *See id.* at 822. Evidence showed that Marchetti's company submitted clearly fabricated reports, "indicating activity from Drs. Chipotle, Lettuce, McDonald, Carl's, Burger, and King." *Id.* At other times, "it appear[ed] that [Marchetti's company] submitted reports artificially multiplying the activity of a single representative." *Id.*

Despite this activity, we found that "the structure of the contract alone [was] not sufficient evidence to produce a conviction under the AKS," and therefore could not lay the predicate for a conspiracy. *Id.* at 826.

Although the activity "was undoubtedly sketchy and maybe even criminal," the Government failed to demonstrate a sufficient connection between Marchetti and the relevant decisionmakers. *Id.* at 824, 827. Because Marchetti's and Donofrio's Vantari activities were substantially similar, Donofrio's Vantari conduct likely does not rise to the level of an AKS violation. Nevertheless, we review the Vantari evidence to determine whether it could independently sustain a conviction.

Donofrio is correct in arguing that *Marchetti* recognized that the AKS should "leave[] room for permissible advertising." *Id.* at 825 n.6 (citing *United States v. Shoemaker*, 746 F.3d 614, 628 (5th Cir. 2014)). Indeed, *Marchetti*, in no uncertain terms, confirmed that "interaction with the relevant decision maker has to be a part of the consideration in evaluating violations of the AKS." *Id.* at 826 n.8. In other words, inducing referrals is problematic; compensating advertisers is not. *Id.* at 825 (quoting *Shoemaker*, 746 F.3d at 628). *Marchetti* posed the question as: "Did Vantari 'intend to induce "referrals," which is illegal,' or did Vantari 'intend to compensate advertisers, which is permissible'?" *Id.* at 826 (quoting *Shoemaker*, 746 F.3d at 629) (cleaned up).

In answering this question, the *Marchetti* court relied on *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004), the "seminal case reversing an AKS conviction on sufficiency." *See Marchetti*, 96 F.4th at 824–27. *Miles* involved the following scheme: (1) Premier Public Relations ("PPR") distributed information regarding Affiliated Professional Home Health ("APRO"); (2) the distributions reached local medical offices; (3) if a physician needed home health care services, the office might contact PPR; (4) if so, PPR gave APRO the patient info for billing purposes; and (5) APRO paid PPR per client gained. *Id.* at 824-25 (quoting *Miles*, 360 F.3d at 479). The determinative factor in *Miles* was that "[t]he payments . . . were not made to

the relevant decisionmaker." *Id.* (quoting *Miles*, 360 F.3d at 480) (alterations in original).

So, we must ask whether the co-conspirators intended to influence "those who make healthcare decisions on behalf of patients." *Id.* at 827. At least with respect to Donofrio's activity, the Government has not provided sufficient evidence demonstrating that Genematrix influenced any physicians or other medical professionals, or received any type of referral for Vantari conduct.[12] The Government tries to distinguish *Marchetti* by stating that "Donofrio had a leading role when it came to activity reports, which featured him endorsing and directing the submission of bogus activity information on several occasions to conceal Vantari's unlawful payments to Genematrix in return for Medicare business." It asserts that he did not actually perform the work he reported, and certainly did not advertise. But this argument runs squarely against our precedent—while Donofrio himself may not have done much in the way of advertising as the ordinary person would understand it, our inquiry is different.

The stark distinction between "referrals" and "advertisers" set forth in *United States v. Shoemaker*,[13] 746 F.3d at 628, alongside the clear statement that relevant decisionmakers must be influenced in *Miles*, 360 F.3d at 480,

---

[12] Although the Government elicited testimony that Arroyo selected distributors who had "access to" and "influence over" physicians, it provided no specific evidence or testimony that Donofrio or others exercised *undue* influence at this time. Indeed, a distributor's access to or non-undue influence over physicians is not only an asset but likely a prerequisite to using their services.

[13] In *Shoemaker*, a local hospital used nursing services produced by a third party. *Id.* at 825. The chairman of the hospital's board asked the nursing company's owner to pay him for each hour that the nursing company billed to the hospital. *Id.* In return, the chairman lobbied the hospital's Chief Operating Officer ("COO") to use the nursing company. *Id.* The COO soon received a raise and began receiving compensation from the nursing company. *Id.* We found this violated the AKS.

shows that the illegal kickbacks often come in the form of paying the *decisionmaker*. That is, to the extent that "Arroyo's express intent was to pay Donofrio in return for arranging Medicare business," Donofrio was advertising in the eyes of the AKS. And that is not changed by the decision to call payments activity-based compensation. The bar for sufficiency may be low, but "[f]or a rational trier of fact to find a violation of the AKS, the government needs to prove *some* evidence that" the relationship between Donofrio and relevant decisionmakers was more like the *Shoemaker* scheme and less like the *Miles* scheme.[14] *Marchetti*, 96 F.4th at 827. As in *Marchetti*, even if this conduct "was undoubtedly sketchy and maybe even criminal," *id.* at 824, the conviction may not stand on this conduct alone.

However, the Codon activity violates the AKS and can therefore serve as an unlawful objective. As the Government points out, we have previously held that the Codon conduct violates the AKS in *Marchetti*. There, we described this portion of the scheme as: "Vantari pays Marchetti, Marchetti is part of a scheme that selects service provider for patient, that selection is apparently never overruled—because it seems to have been hidden from patients and providers." *Id.* at 827. The evidence presented at trial shows that Donofrio was involved in this conduct.[15] The individuals involved in the Codon activity became the relevant decisionmakers: they influenced selection of services without letting the patient or physician decide. Of course, these acts resulted in payment to Donofrio. "That is a substantive AKS violation." *Id.*

_____

[14] The Vantari scheme was "[l]ike the fact pattern referenced in *Miles*," and was not sufficiently similar to the scheme in *Shoemaker*. *Id.* at 826.

[15] Donofrio does not challenge the unlawful purpose inquiry, instead focusing on joinder of conspiracies, venue, jury instructions, and willfulness.

To the extent that Donofrio challenges his involvement, a reasonable jury could have found otherwise. While Marchetti may have visited the distribution center and motivated Vantari to align swab-related protocols, Donofrio connected Codon and Althea. After Conn was hired, Donofrio emailed Arroyo a "cheat sheet" on filling out Althea requisition forms and offering to introduce Conn to an employee familiar with filling out those forms. Such activity is especially questionable considering doctors filled out requisition forms. And, eventually, Codon payments would be passed along to Donofrio—a kickback—thus violating the AKS. Indeed, Donofrio filtered money to Codon through Genematrix early in the scheme. The Government provided sufficient evidence suggesting Donofrio's involvement with this scheme. "The bar for sufficiency is low," *id.*, and here, the Government satisfied its burden.

2

Nevertheless, involvement in an unlawful scheme is meaningless without willfulness. This requires a showing that Donofrio knew "of the unlawful objective and voluntary agreement to join the conspiracy." *Marchetti*, 96 F.4th at 824 (quoting *Barnes*, 979 F.3d at 295). An act is "willful" if it "was committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law." *United States v. Ricard*, 922 F.3d 639, 648 (5th Cir. 2019). This is a general inquiry: the AKS does not require "actual knowledge of this section or specific intent to commit a violation of this section." 42 U.S.C. § 1320a-7b(h). And although the Vantari conduct is unable to support a conviction on its own, it may be considered during the willfulness inquiry. *See Marchetti*, 96 F.4th at 828.

Donofrio's state of mind is framed by his past: he was a "smart" and "seasoned" healthcare professional who had previously worked for a variety

of pharmaceutical and healthcare companies. While at one of these companies, he participated in and successfully completed an AKS compliance training. But the evidence is not just circumstantial.

Donofrio, when signing on with Arroyo, cautioned him that his "contract did have a lot of red flags with regards to Medicare compliance." Yet, he signed the agreement. He was similarly undeterred by his lawyer's email "strongly recommend[ing] against it." Indeed, Donofrio was informed that the agreement "fail[ed] to include *necessary compliance language* for AKS" and "contain[ed] multiple provisions . . . in *direct contradiction of Medicare Regulations*." Faced with these cautions, he "made it clear . . . to stress business over legal." He later wrote that off as "a poor choice of words," but his actions suggest otherwise. He responded to his attorney, agreeing and noting that Genematrix was "a ship without a port" and noting that Vantari "may just be a temporary stop." He then signed the contract.

Donofrio argues that Patterson separately informed him that the contract did not violate the AKS. It is true that emails exist in which Patterson stated that the percentage approach of gross receipts is "acceptable under the AKS." But there is no indication that he was referring to Medicare reimbursements in that email.[16] Donofrio also stresses that Patterson wrote: "Why would anyone agree to not receive any commissions on tests that are reimbursed by any Federal Health Care Program?" Also true. But he said this in direct reference to a marketing agreement—one that, presumably, contemplates advertising, which is unproblematic under the AKS. *See Marchetti*, 96 F.4th at 826.

---

[16] Again, we must make all reasonable inferences in favor of the Government.

And, finally, of course, Donofrio was involved in submitting bogus activity reports, and he "acknowledge[d] that he understood that [the bonuses] were simply a cover for federal reimbursement payments."

With respect to Codon, Donofrio introduced Arroyo to Althea's CEO. Arroyo testified that Donofrio "was aware of why we were sending that Medicare business down" to Althea—to avoid compliance with Medicare laws. Donofrio's willfulness is further demonstrated by his desire to train "our girl" in Arizona, Conn, on how to fill out Althea forms. His assertion that he merely matched Arroyo's language when referring to Conn as "our girl" fails to overcome the inference in favor of the Government and does not exonerate him of his actions. Moreover, Genematrix funneled money from Codon to Vantari.

The evidence belies Donofrio's challenge that he knew nothing of the requisition form copying. He points to his reaction to the Nasser email, in which Althea's Vice President emailed him directly about an incomplete requisition form having learned that the physician filled out a Vantari form. Nasser raised various concerns, not the least of which was the mismatched signatures on the forms. Donofrio forwarded the exchange to Arroyo, stating: "Need to know what's going on or what they think is going on." At trial, he testified that this email demonstrated his courage to confront Arroyo, thus proving his innocence. But viewing this in the light most favorable to the Government, *Warren*, 986 F.3d at 562–63, the email may also be read in a panicked tone: he needs to know what Althea thinks is happening, lest Vantari and Genematrix get caught in the act. And such a reading is certainly logical considering the wealth of other evidence demonstrating willfulness and Nasser's tone of reprehensibility.

Accordingly, we find that Donofrio had the requisite willfulness to be convicted.

3

The final requirement is that some member of the conspiracy commit an overt act in furtherance of the conspiracy. *See Marchetti*, 96 F.4th at 824. On appeal, Donofrio has presented no argument regarding this element. The jury was presented with substantial evidence demonstrating that overt acts were taken in furtherance of this conspiracy by several of its members. Accordingly, we decline to reverse on this basis.

IV

We next consider whether the district court abused its discretion in its advice-of-counsel jury instruction.

We review challenges of jury instructions for an abuse of discretion, and we afford "substantial latitude to the district court in describing the law to the jury." *United States v. Williams*, 610 F.3d 271, 285 (5th Cir. 2010). We ask "whether the charge, as a whole, was a correct statement of the law and whether it clearly instructed the jurors as to the principles of the law applicable to the factual issues confronting them." *United States v. Wright*, 634 F.3d 770, 774 (5th Cir. 2011) (quoting *United States v. Santos*, 589 F.3d 759, 764 (5th Cir. 2009)). "Erroneous jury instructions are harmless if a court, 'after a thorough examination of the record, is able to conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error.'" *United States v. Grant*, 850 F.3d 209, 217 (5th Cir. 2017) (quoting *United States v. Cessa*, 785 F.3d 165, 186 (5th Cir. 2015)).

Donofrio argues that the district court abused its discretion by providing the jury an advice-of-counsel instruction that "invited the jurors to disregard [his] entire defense" that he relied in good faith on his attorney's advice that the *Vantari* commissions did not violate the AKS. But we are affirming Donofrio's conviction because of the Codon conduct. There is no evidence that Donofrio sought Patterson's advice regarding the Codon

activity.  Accordingly, even if the jury instruction deprived Donofrio of his defense to the Vantari conduct, any such error was harmless.

V

We next consider whether the district court erred in excluding witnesses Donofrio claims were exculpatory.

A

We review the invocation of the Fifth Amendment's privilege against self-incrimination for abuse of discretion.  *United States v. Follin*, 979 F.2d 369, 374 (5th Cir. 1992).  The district court "must make a proper inquiry into the legitimacy and scope of the witness'[s] assertion of his Fifth Amendment privilege.  A blanket assertion of the privilege without inquiry by the court[] is unacceptable." *United States v. Goodwin*, 625 F.2d 693, 701 (5th Cir. 1980).  The particularized inquiry considers three elements: (1) "whether or not the privilege is well-founded"; (2) "the parameters of [the witness's] Fifth Amendment rights . . . in the context of the testimony" sought; and (3) whether the testimony is material and relevant.  *See United States v. Melchor Moreno*, 536 F.2d 1042, 1049-50 (5th Cir. 1976) (quoting *United States v. Gomez-Rojas*, 507 F.2d 1213, 1220 (5th Cir. 1975)); *United States v. Waddell*, 507 F.2d 1226, 1228 (5th Cir. 1975) (requiring the trial court to "make a searching inquiry into the validity and extent of [the witness's] Fifth Amendment claims").  The trial court is given broad discretion in making this determination, *United States v. Ramos*, 537 F.3d 439, 448 (5th Cir. 2008), but the analysis above protects the defendant's Sixth Amendment right for witnesses to testify in their favor, *see Melchor Moreno*, 536 F.2d at 1045–46.

An individual asserting a Fifth Amendment privilege must have "reasonable cause to apprehend danger from a direct answer." *Hoffman v. United States*, 341 U.S. 479, 486 (1951).  For the privilege to be asserted, "it need only be evident from the implications of the question, in the setting in

which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Id.* at 486–87. It must be "'perfectly clear, from a careful consideration of all the circumstances in the case, that . . . the answer(s) cannot possibly have such tendency' to incriminate" to deny the invocation. *Id.* at 488 (emphases omitted) (quoting *Temple v. Commonwealth*, 75 Va. 892, 898 (1881)). Of course, because there must be a legitimate danger of prosecution, "the Fifth Amendment's privilege against self-incrimination does not apply after the relevant limitations period has expired." *Stogner v. California*, 539 U.S. 607, 620 (2003) (citing *Brown v. Walker*, 161 U.S. 591, 597–98 (1896)).

Courts should ask a witness to "allude in very general, circumstantial terms to the reasons why he feels he might be incriminated by answering a given question." *Melchor Moreno*, 536 F.2d at 1046. The judge need only examine the witness "far enough to determine whether there is a reasonable ground to apprehend danger to the witness from his being compelled to answer." *Id.* If the danger possibly exists, the court shall recognize the privilege without requiring the witness to give the potentially inculpatory answer. *See id.* If it grows clear that the witness "could 'legitimately refuse to answer essentially all relevant questions,'" *Goodwin*, 625 F.2d at 701 (quoting *United States v. Gomez-Rojas*, 507 F.2d 1213, 1220 (5th Cir. 1975)), then the witness may be excused.

B

Donofrio challenges the district court's grant of two witnesses' blanket invocations of the Fifth Amendment. He complains that it accepted the invocation of the privileges through an ex parte hearing "in contravention of established Circuit precedent." He also argues that the court failed to conduct a sufficiently particularized inquiry by failing to analyze how each

28

23-40586
c/w No. 24-40002

witness would testify about each exhibit, and failing to balance Donofrio's Sixth Amendment right with the witnesses' Fifth Amendment rights. Finally, he argues that the Vantari conduct was insufficient to demonstrate an AKS violation, and that the statutes of limitations of which the potential witnesses were concerned had run. Each argument fails.

As an initial matter, the district court faithfully adhered to the strictures of a particularized hearing as described by this court, including conducting a sealed proceeding with questioning of Donofrio's counsel and the potential witnesses. Counsel for the witnesses provided detailed responses supporting the invocation of the privilege, and both confirmed that no answer could be provided without the risk of inculpating themselves.

This comports with our precedent. Donofrio's argument that the inquiry was not sufficiently particularized misses the mark: the court is merely required to consider the scope of the privilege, and need only ask the witness to "allude in very general, circumstantial terms to the reasons why he feels he might be incriminated by answering a given question." *Melchor Moreno*, 536 F.2d at 1046. The court does *not* need to walk through each proposed exhibit, as Donofrio implies. Despite Donofrio's arguments, we need only see that *any* danger of incrimination may exist. *Id*. The record does not support his arguments to the contrary.[17]

---

[17] Donofrio's Sixth Amendment argument similarly fails. He cites *United States v. W.R. Grace*, 439 F. Supp. 2d 1125, 1140 (D. Mont. 2006), for the proposition that the court should have balanced Donofrio's Sixth Amendment right with the witnesses' potential Fifth Amendment rights. This argument is misguided. While a Sixth Amendment right to compel witnesses in favor of the defense certainly exists, and is certainly strong, such right is protected by the strict requirements for invoking the Fifth Amendment.

Accordingly, the district court did not abuse its discretion in recognizing the Fifth Amendment privilege applied to each witness as to the entire scope of their potential testimony.

## VI

We next consider whether the district court erred in excluding certain exhibits, each of which Donofrio asserts is exculpatory.

## A

A district court's evidentiary rulings are reviewed for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 141 (1997). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). If there is an abuse of discretion, the court next "review[s] the error under the harmless error doctrine, affirming the judgment, unless the ruling affected substantial rights of the complaining party." *Id.* The "test for harmless error in this context is 'whether the trier of fact would have found the defendant guilty beyond a reasonable doubt with the additional evidence inserted.'" *United States v. Roberts*, 887 F.2d 534, 536 (5th Cir. 1989) (quoting *United States v. Lay*, 644 F.2d 1087, 1091 (5th Cir. Unit A May 1981)).

## B

Donofrio challenges the following exhibits: (1) Genematrix contracts; (2) Clay Patterson emails; (3) Patricia Courville emails; and (4) Snell and Wilmer invoices. We review each below.

## 1

Donofrio first challenges the exclusion of Genematrix contracts to market genetic tests for Vantari during the timeline of the conspiracy. He notes that the signatories on the other side of the contracts both reviewed and

testified about the contracts. Before the district court, he argued that such contracts demonstrate that he lacked the requisite willfulness to be convicted. He now also argues that because they were admissible under Federal Rules of Evidence 803(6) and 902, they should be admitted.[18]

The district court excluded these contracts at trial because similar contracts had been admitted and "the cumulative effect of those [contracts] is misleading." The court excluded other such contracts because they were irrelevant—the jury was not asked to consider them—and the court disagreed that they were exculpatory. Still others were not admitted in their original forms, but witnesses testified to their contents. The district court highlighted that "similar contracts were admitted such that admitting these particular contracts would have been cumulative." Further, because Donofrio testified for two days, the jury had the opportunity to weigh his willfulness through his testimony regarding these contracts.

Donofrio has failed to demonstrate how these contracts were exonerative. Considering the evidence, we cannot conclude that the district court abused its discretion.

2

Donofrio next challenges that a series of emails from his attorney, Clay Patterson, should have been admitted because they demonstrate his good-faith reliance on advice of counsel. However, his assertion that the court excluded the emails because they inculpated Patterson is misleading. The court stated on three separate occasions that the emails were not legal advice, ultimately noting that while they were inculpatory to Patterson, they did *not*

---

[18] Donofrio asks us to find that the contracts were admissible under Federal Rule of Evidence 803(6). However, he failed to raise that challenge before the district court at trial. Therefore, this challenge was not sufficiently preserved.

exculpate Donofrio.[19]  Eventually, the Government introduced these emails, but for an admissible purpose: to demonstrate Donofrio's state of mind.  The court did not abuse its discretion by excluding these emails on the basis that they reflected business advice.

Donofrio's argument that the exhibits were admitted as exculpatory at his first trial is irrelevant.  The Government did not object to their admission at the first trial.[20]  Moreover, the court found that the evidence was not relevant to the testimony at issue in the second trial, nor was there a rule under which the evidence could be admitted.  The district court properly considered the emails and determined that they could not be admitted as Donofrio desired.  This is not an abuse of discretion.

3

Donofrio challenges that he was unable to rebut the statement that he falsified activity reports through excluded emails.  He now asserts that the emails were exculpatory because they undermined the premise that he enlisted Genematrix representatives to falsify forms.  He contends that Patricia Courville, Genematrix's director of operations, contacted Genematrix sales representatives requesting the reports.  He also argues that another email in which a representative, Julie Heidemann, sent an activity report to Courville was improperly excluded.

The district court excluded these emails for several reasons.  First, it had previously admitted an email from Courville regarding activity reports during Donofrio's testimony, providing him the very opportunity to rebut

_____

[19] In the emails, Patterson provided Donofrio the number of individuals that would need to be listed under activity-based compensation models to simulate federal reimbursements.

[20] Rulings at the first trial were expressly non-binding at the second.

the falsification allegations that he claims he was denied.  Second, the court sustained the Government's objections that the emails were (1) not privileged and therefore not timely disclosed; (2) inadmissible attempts to clarify previous statements; and (3) of suspect authenticity.  Additionally, the district court sustained the Government's objection to Heidemann's email without prejudice to admit it at a later time, should testimony sufficiently open the door to its admission.  But the email was never admitted, largely because of Donofrio's "untimely disclosure and inability to lay a proper foundation."

The court did not abuse its discretion.  The emails were similar to others it had previously admitted and were disclosed on the eve at trial.  More importantly, Donofrio failed to demonstrate how they exculpated him, especially given his personal knowledge of similar emails and opportunity to rebut the suggestion that he falsified reports, rendering any error harmless.

4

Finally, Donofrio argues that the district court wrongfully excluded Snell & Wilmer invoices that would "rebut the premise placed before the jury that Vantari retained lawyers who spent hours and weeks working on an activity-based contract . . . to come back into compliance with the [AKS]."  He claims that the Government never objected to the notice of the evidence and challenges the ability of a witness to testify about certain records.

First, the district court did not exclude the evidence on grounds of authenticity, as Donofrio claims, but on the grounds that the case agent through whom Donofrio sought to introduce the records lacked personal knowledge.  Donofrio's counterargument that the case agent was permitted to testify about his AKS training is inapposite.  The Government laid a foundation.  It then sought to admit a record and manual demonstrating that Donofrio was on notice of the AKS and its requirements.  Donofrio only

objected for lack of admissibility and under Rule 403; notably, an objection for lack of foundation is not present in the record.

There is no doubt that the case agent lacked the requisite personal knowledge about the firm invoices. Donofrio had every right to call an additional witness with personal knowledge, but he declined to. The court did not abuse its discretion in excluding the exhibits.

## VII

Next, we determine whether the district court erred when determining the value of the bribe under relevant Sentencing Guidelines.

### A

"Where a defendant preserves a procedural sentencing error, such as a Sentencing Guidelines calculation, by objecting before the district court, we review the sentencing court's factual findings for clear error and its interpretation or application of the guidelines de novo. . . . If established, such error shall nevertheless be disregarded if it is harmless . . . ." *Marchetti*, 96 F.4th at 834 (quoting *United States v. Randall*, 924 F.3d 790, 795 (5th Cir. 2019)). A district court's determination of what constitutes relevant conduct is factual and reviewed for clear error. *United States v. Peterson*, 101 F.3d 375, 384 (5th Cir. 1996) (citing *United States v. McCaskey*, 9 F.3d 368, 376 (5th Cir. 1993)). Similarly, a district court's determination of amount of loss is a factual finding. *Id.* (citing *United States v. Brown*, 7 F.3d 1155, 1159 (5th Cir. 1993)). And "[t]here is no clear error if the district court's finding is plausible in light of the record as a whole." *United States v. Juarez-Duarte*, 513 F.3d 204, 208 (5th Cir. 2008) (per curiam).

### B

Donofrio challenges his sentence on numerous grounds. Because he succeeds on the grounds that the Vantari conduct is not "illegal," we need

not consider his other challenges.  Relevant to this appeal is that the amount used by the district court, $769,000, falls between the levels in § 2B1.1(b)(1)(H) (more than $550,000) and (G) (more than $1,500,000). Accordingly, for his sentence to be reversible, the value of the bribe or improper benefit conferred must have been below $550,000.

Donofrio argues that the Vantari conduct itself was not illegal, and that the non-Medicare related conduct did not violate any law.  The Government, for its part, provided a California statute that it asserted was violated by the Vantari conduct.  *See Shah*, 95 F.4th at 384 ("[T]he Government identified several statutes that the private-pay surgeries may have violated.  The district court recognized that the Government 'had proven by a preponderance of the evidence' the relevant conduct with which it sought to enhance the sentence." (alterations omitted)).  However, the California statute applies to private payors.  Because the $769,000 value was derived from Medicare payors, we assume the provided statute was not violated.

> The relevant law was described in *Shah*, which reads as follows:
>
> The private-pay surgeries were relevant conduct under U.S.S.G. § 1B1.3 and properly included within the calculation. The sentencing guideline is broad, defining relevant conduct to include "*all* acts and omissions" that occurred "during the commission of the offense" or as "part of the same course of conduct or common scheme."  "An unadjudicated offense may be part of a 'common scheme or plan' if it is 'substantially connected to the offense of conviction by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*.' "

*Shah*, 95 F.4th at 383 (first quoting U.S.S.G. § 1B1.3; and then quoting *United States v. Ortiz*, 613 F.3d 550, 557 (5th Cir. 2010)).  Donofrio is correct in stating that *Shah* did not change the requirement that relevant conduct must

have been illegal.  *See id.* at 383-84 ("[Defendants] have no answer for this other than an argument that the private-pay surgeries involved different victims, but that does not matter given the substantial overlap of the *crimes* in all other ways." (emphasis added)).  This begs the question: was the Vantari conduct illegal under the Sentencing Guidelines?

As discussed at length above, the Vantari conduct, on its own, did not violate the AKS.  The Government did not present the district court with an alternative grounds under which the activity-based commissions with Vantari *alone* was criminal.  According to the presentence report, Genematrix received $84,213.19 from Codon.  Although the district court may have properly found that *those* payments violated the law by a preponderance of the evidence, *Marchetti*'s holding and ours today compel the conclusion that the remaining payments—stemming from non-illegal activity—cannot be used to increase Donofrio's sentence.  *See Shah*, 95 F.4th at 383–84.

While it is possible that the Vantari conduct violated some other state or federal statute, it is the Government's burden to prove that by a preponderance of the evidence.  It has not done so here.  Because the remaining non-Vantari value falls below $550,000, we VACATE Donofrio's sentence and REMAND for resentencing.

## VIII

Lastly, we come to Donofrio's challenge that the district court erred in determining the value of the forfeiture judgment.

Forfeiture is a part of sentencing.  *United States v. Ayika*, 837 F.3d 460, 468 (5th Cir. 2016).  "Accordingly, [this court] review[s] the district court's findings of fact pertaining to a forfeiture order 'under the clearly erroneous standard,' and 'the question of whether those facts constitute legally proper forfeiture de novo.'"  *Id.* at 468–69 (quoting *United States v. Juluke*, 426 F.3d 323, 326 (5th Cir. 2005)).  The forfeiture statute, 18 U.S.C. § 982(a)(7), reads

as follows: "The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." *Shah* confirms that "[t]he analytical inquiry is whether the defendant would have received the property 'but for' his criminal conduct." *Shah*, 95 F.4th at 389.

The district court entered a forfeiture judgment of $769,000, in line with the amount considered during sentencing. As *Shah* described, the forfeiture statute requires "criminal conduct" so support a forfeiture judgment. Therefore, to the extent the Vantari conduct was *not* criminal for the purposes of Donofrio's conviction, the district court erred in including any related funds in the forfeiture judgment. We therefore VACATE the forfeiture judgment and REMAND for recalculation of the forfeiture value.

IX

Having considered the evidence and all underlying challenges to the trial, we find that a reasonable juror could find that Donofrio violated the law beyond a reasonable doubt. We therefore AFFIRM his judgment of conviction. However, following *Marchetti* and our holding today that Donofrio's Vantari conduct did not violate the law, the district court erred in considering Vantari conduct in each of his sentence and forfeiture judgment, absent some proof of its illegality. We therefore VACATE both his sentence and forfeiture judgment and REMAND for resentencing and recalculation of the proper forfeiture value.